HEWITT v. STORY et al.

(Circuit Court of Appeals, Ninth Circuit.   November 1, 1894.)

No. 102.

IRRIGATION—ABANDONMENT OF WATER RIGHTS—IRRIGATING DITCHES.

R. and others, in 1869, located a ditch appropriating, for the purpose of irrigating their lands, the waste water of the A. river, remaining after the N. F. and S. F. ditches, previously located, had been supplied. Such ditch was called the "B. R. Ditch." The water appropriated by it being insufficient for their lands, the owners of the B. R. ditch purchased shares in the S. F. ditch, and diverted the water so acquired through the B. R. ditch. Subsequently, by their consent, other owners of shares in the S. F. ditch diverted their water through the B. R. ditch, and in and after 1874 all the water belonging to the owners of the S. F. ditch was taken by them through the B. R. ditch, with the consent of the owners thereof, on condition of contributing to the expense of enlarging and repairing that ditch. Subsequently, the route of the B. R. ditch was twice changed, and the water belonging to the owners of the S. F. ditch was for more than five years conducted through such changed B. R. ditch, and all the water received through such ditch was allotted according to the interests of the owners of such S. F. ditch, who took complete possession, use, and control of the B. R. ditch, adversely to any right or claim under the original location. Complainant and his predecessors in title, the owners of the land originally supplied by the B. R. ditch and the locators of such ditch, knew of and acquiesced in such use, and shared in the water only according to their shares in the S. F. ditch, without objection to such use, and contributed to the alteration and repair of the B. R. ditch only in proportion to their shares in the S. F. ditch. In 1887 complainant

brought suit to establish a right to a specific quantity of the water of the A. river, in virtue of the appropriation by the B. R. ditch. *Held*, that the use of the waste water in the B. R. ditch was abandoned through nonuser on the part of complainant and his predecessors in title. Knowles, District Judge, dissenting.

Appeal from the Circuit Court of the United States for the Southern District of California.

This was a suit in equity by Isaac L. Hewitt against Warren Story and 66 others to establish a right to certain waters for irrigation purposes. A motion to dismiss was denied (39 Fed. 158), and the cause was next heard on objections by certain of the defendants to the amended bill of complaint. The objections were disallowed. 39 Fed. 719. Subsequently, on further hearing, the bill was dismissed (51 Fed. 101), and complainant now appeals.

This is a suit in equity. The bill of complaint alleges the wrongful and unlawful diversion of certain waters by the appellees, 67 in number, including certain corporations, companies, associations, and individuals, using and claiming water by appropriation from the Santa Ana river, in San Bernardino county, Cal. It prays for a decree entitling appellant to a specific quantity of water, and for an injunction, etc. The bill was filed in January, 1887. Appellant claims to be the owner in possession, and entitled to the possession and use, of 333⅓ inches, under a 4-inch pressure, of the waters of the Santa Ana river, which he alleges were appropriated by his predecessors in interest through and by means of a certain ditch known as the "Berry Roberts Waste-Water Ditch." The Santa Ana river is an unnavigable stream of running water, flowing through sundry wild cañons and ravines in the San Bernardino mountains, and emerging therefrom into the San Bernardino valley through the mouth of a steep ravine near the eastern boundary of the valley; and the waters thereof have been and are held and owned, for many miles above and below the entrance to the Berry Roberts ditch, exclusively by right of appropriation, and used generally for the purpose of irrigation. Long prior to the location of the Berry Roberts ditch, two appropriations had been made of the waters of the Santa Ana river,—one by means of the North Fork ditch, owned by the North Fork Water Company, a corporation, which taps the river near the point where it debouches from the mountains into the valley; the other by means of the South Fork ditch, owned by an association of individuals designated in the bill of complaint as the South Fork & Sunnyside Division of the Santa Ana River, which takes water from the river some distance lower down. The owners of these ditches have, at all times since acquiring their water rights, kept these ditches in repair. Prior to 1860 there were but few people using the water from the ditches, but, before the Berry Roberts ditch was located, the number had been largely increased. The ditches have since been enlarged, and many thousands of dollars have been expended thereon. The actual extent of the appropriation by the North Fork and South Fork ditches, prior to the location of the Berry Roberts ditch, is not clearly defined, and, under the views hereinafter expressed, the precise amount of water which each ditch is entitled to need not be determined. Subsequent to the location of the Berry Roberts ditch, two appropriations of water from the Santa Ana river nearer its head have been made: One, the Brown and Judson ditch, owned by the Redlands Water Company, a corporation, which was located in the spring of 1881, and conveys water to the town of Redlands for irrigation and domestic purposes. Every year since its construction, extensions and improvements, involving large expenditures of money, have been made. The other, the Bear Valley dam and reservoir, owned by the Bear Valley Land & Water Company, a corporation, was located in June, 1883. This corporation, in the spring of 1883, bought three or four thousand acres of land situated in the lower portion of Bear valley, and constructed a dam at the point where the lower edge of the valley adjoins the head of Bear cañon, for

the purpose of obtaining, above that dam, the water that would otherwise have run to waste in the winter and spring months. This dam is of granite masonry, 20 feet thick at its base, about 60 feet high, and 300 feet long, forming a lake about 5 miles long and over one-half of a mile wide, of an average depth of about 13 feet. Bear creek is fed by small tributaries which come into it, at different points, all of the way from where it leaves Bear valley down to its junction with the Santa Ana river. The construction of the dam does not appear to have affected the flow of water down Bear creek during the irrigating season. The Berry Roberts ditch was located in 1869, by Berry Roberts, Henry Suverkrup, and George A. Craw, as a waste-water ditch appropriating "the waste water of the Santa Ana river" remaining therein after the North Fork and South Fork ditches should be fully supplied. The locators of the Berry Roberts ditch, at the time of its location, occupied, possessed, and claimed separate and distinct portions of land situated in section 16, township 1 S., range 3 W. of the San Bernardino meridian. Roberts claimed 160 acres, and Suverkrup and Craw, in the aggregate, 240 acres. The ditch constructed by them, and through which they appropriated the waste water, tapped the river on the south side between the head of the North Fork and the South Fork ditches. At the time the Berry Roberts ditch was located, and for many years thereafter, there existed in San Bernardino county a board of water commissioners, created by an act of the legislature of the state of California, whose duties were to regulate the distribution of water in accordance with the rights of the parties in interest, and they were invested with authority to appoint water overseers, etc. In the records kept by this board appears the following entry: "By request of Henry Suverkrup, Berry Roberts, and G. A. Craw, W. T. Morris and E. Kerfoot, water commissioners for San Bernardino county, California, located a water ditch to be known as the 'Berry Roberts Ditch.' The water claimed by the aforesaid parties for this ditch is the waste water of the Santa Ana river, taken out in the southeast bank of said river about four miles northeast from section sixteen (16), township No. 1 south, range No. 3 west, San Bernardino meridian, running thence nearly a southwest direction to the said sixteenth (16) section, and to be used for irrigating, and to be equally apportioned among said parties on the land of the said sixteenth (16) section owned by said parties; and also Berry Roberts was appointed overseer for the aforesaid ditch for the present year. Done on the 19th day of February, A. D. 1870. W. T. Morris. E. Kerfoot." Roberts thereupon took charge of the Berry Roberts ditch, and with Suverkrup and Craw conducted the waste water running therein to their respective lands, in section 16, for irrigation and domestic purposes. The lands which they then had under cultivation amounted, in the aggregate, to not exceeding 100 acres, about 50 acres thereof being in grain, and the balance in fruit trees and vegetables. They permitted one or more of their neighbors to participate in the use of the water on condition that they should contribute to the necessary repairs of the ditch. In 1870, Roberts conveyed his interest in the 160 acres of land claimed by him, together with his interest in the Berry Roberts ditch and the waste water, to one Ball, who thereupon succeeded Roberts as water overseer. In 1872, Craw conveyed his interest in 160 acres of land claimed by him to Suverkrup, and also his interest in the Berry Roberts ditch and in the waste water. During the years 1870, 1871, and 1872, the then owners of the Berry Roberts ditch used the waste water running therein, at all times when they could get any water, for the irrigation of the lands which they then had under cultivation; but the waste water running in said ditch was wholly insufficient to supply their needs.

There is more or less confusion in the testimony as to the name of the South Fork ditch. It is sometimes called "South Fork," sometimes "Sunnyside Division of South Fork," but more frequently, in relation to its connection with the Berry Roberts ditch, it is designated as the "Timber Ditch," by which name it will hereafter be called. Upon ascertaining the fact that no reliance could be placed in the supply of waste water from the Berry Roberts ditch during the irrigating season, Ball purchased 40 shares in the Timber ditch and in the water appropriated therein, and Suverkrup

purchased 30 shares in the Timber ditch and in the water flowing therein. The quantity of water thus acquired by them was diverted through the Berry Roberts ditch to their respective tracts of land in section 16. Subsequently, by the consent of Ball and Suverkrup, various other owners of shares in the Timber ditch appropriation diverted and conducted the quantity of water to which they were respectively entitled, by virtue of their interests in the Timber ditch, through and by means of the Berry Roberts ditch. The Berry Roberts ditch continued in charge of the water overseers appointed by the board of water commissioners. In June, 1874, Suverkrup conveyed his interest in the 240 acres of land then claimed and possessed by him, together with his interest in the Berry Roberts ditch and in the waste water, and also the 30 shares in the Timber ditch, to one Borron, the immediate predecessor of appellant. During the year 1874, while Ball and Borron were diverting and using the water belonging to them as share owners in the Timber ditch through the Berry Roberts ditch, some of the other owners of shares in the Timber ditch applied to them for permission to divert and conduct the water belonging to their shares in the Timber ditch through the Berry Roberts ditch. Permission was given upon the condition that the parties should contribute and aid in enlarging and repairing the Berry Roberts ditch, which condition they complied with. After the year 1874, no water was taken from the river through the Timber ditch; but all of the water theretofore diverted through and by means of the Timber ditch was thereafter diverted through and by means of the Berry Roberts ditch, and the owners of shares in the Timber ditch appropriation (with but few, if any, exceptions) continued to use the water, to which they were entitled by virtue of that appropriation, through the Berry Roberts ditch. It is not shown that permission to make this change was granted to any considerable number of the shareholders in the Timber ditch appropriation; but it does affirmatively appear that the shareholders in the Timber ditch took actual possession and control of the Berry Roberts ditch, and through it diverted and conducted the water that had theretofore been diverted and conducted by means of the Timber ditch. As early as 1877, if not before, all of the water diverted through the Berry Roberts ditch was distributed by the water overseer in charge, and was used by the respective claimants of it, including Ball and Borron, in proportion to the number of shares held by them in the Timber ditch appropriation. The Berry Roberts ditch was enlarged and kept in repair by the parties so using it, and during the year 1877, upon application to the board of water commissioners, a change was made in its route, and in the place of its diversion of the water from the river, in order to avoid a sand wash which caused a loss of water. The board of water commissioners then directed that the ditch should thereafter be known as the "South Fork of Santa Ana." In 1878 another change was made, by the construction of what is designated by some of the witnesses as the "Stone Ditch," and referred to by others as the "South Fork Sunnyside Division Ditch." After this change was made, the water running in the Santa Ana river during the irrigating season was all absorbed and taken in nearly equal quantities by the North Fork and South Fork ditches. The Sunnyside Division of the South Fork ran into the old Berry Roberts waste-water ditch about one mile from where the water was taken out of the river. The water diverted and conveyed by means of the South Fork or Timber ditch, with its divisions and systems of conducting the water, continued to be allotted to the respective claimants therein in the proportion of the number of shares held by them. It was so allotted, diverted, and used for more than five years during Borron's ownership, and during all that time Borron in person, or by his authorized agent, Col. Tolles, acquiesced in and accepted such allotment of the waters flowing in the ditch. In October, 1881, Borron contracted to sell his land and water rights to appellant, and the sale was perfected, and the deed therefor was executed and delivered in the spring of 1882; and the water was continuously thereafter allotted, diverted, and used the same as before the sale. It appears from the testimony that an inch of water is sufficient to irrigate from five to six acres of land, and is considered to be of the value of $1,000 for the purposes of irrigation.

The circuit court, upon a review of the facts, found, as a conclusion of law, "that there was an abandonment by the immediate grantor of the complainant, as well as by the complainant himself, of the water embraced by the appropriation upon which the suit is based," and upon this ground, without any consideration of the other points involved in the case, dismissed the bill of complaint, and rendered judgment in favor of appellees for their costs. Hewitt v. Story, 51 Fed. 101.

W. F. Herrin and H. L. Gear, for appellant.

R. E. Houghton, for appellees.

Before McKENNA, Circuit Judge, and KNOWLES and HAWLEY, District Judges.

HAWLEY, District Judge (after stating the facts). The argument of this case extended over a very wide range, embodying within its scope nearly every principle that has ever been enunciated by the courts, touching in any manner upon the question of the rights of appropriation of water from the public streams or upon private lands,—the incipiency of such rights, the manner of their acquisition, how they may be kept up and maintained, and in what manner and under what circumstances such rights may be lost. We consider the law to be well settled that the right to water flowing in the public streams may be acquired by an actual appropriation of the water for a beneficial use; that, if it is used for irrigation, the appropriator is only entitled to the amount of water that is necessary to irrigate his land by making a reasonable use of the water; that the object had in view at the time of the appropriation and diversion of the water is to be considered in connection with the extent and right of appropriation; that if the capacity of the flume, ditch, canal, or other aqueduct, by means of which the water is conducted, is greater than is necessary to irrigate the lands of the appropriator, he will be restricted to the quantity of water needed for the purposes of irrigation, for watering his stock, and for domestic use; that the same rule applies to an appropriation made for any other use or purpose; that no person can, by virtue of his appropriation, acquire a right to any more water than is necessary for the purpose of his appropriation; that, if the water is used for the purpose of irrigating lands owned by the appropriator, the right is not confined to the amount of water used at the time the appropriation is made. He would be entitled, not only to his needs and necessities at that time, but to such other and further amount of water, within the capacity of his ditch, as would be required for the future improvement and extended cultivation of his lands, if the right is otherwise kept up; that the intention of the appropriator, his object and purpose in making the appropriation, his acts and conduct in regard thereto, the quantity and character of land owned by him, his necessities, ability, and surroundings, must be considered by the courts, in connection with the extent of his actual appropriation and use, in determining and defining his rights; that the mere act of commencing the construction of a ditch with the avowed intention of appropriating a given quantity of water from a stream gives no right to the water unless this purpose and intention are carried out by the reasonable, diligent, and

effectual prosecution of the work to the final completion of the ditch, and diversion of the water to some beneficial use; that the rights acquired by the appropriator must be exercised with reference to the general condition of the country and the necessities of the community, and measured in its extent by the actual needs of the particular purpose for which the appropriation is made, and not for the purpose of obtaining a monopoly of the water, so as to prevent its use for a beneficial purpose by other persons; that the diversion of the water ripens into a valid appropriation only where it is utilized by the appropriator for a beneficial use; that the surplus or waste water of a stream may be appropriated, subject to the rights of prior appropriators, and such an appropriator is entitled to use all such waters; that, in controversies between prior and subsequent appropriators of water, the question generally is whether the use and enjoyment of the water for the purposes to which the water is applied by the prior appropriator have been in any manner impaired by the acts of the subsequent appropriator. These general principles are of universal application throughout the states and territories of the Pacific coast. They have, in one form or another, been declared, upheld, and maintained by the courts by a uniform current of decisions in California ever since the decision in Eddy v. Simpson, 3 Cal. 249. We cite a few of the many cases upon this subject: Kelly v. Water Co., 6 Cal. 106; Kimball v. Gearhart. 12 Cal. 28; Ortman v. Dixon, 13 Cal. 34; Weaver v. Lake Co., 15 Cal. 274; McKinney v. Smith, 21 Cal. 374; Hill v. Smith, 27 Cal. 476; Water Co. v. Powell, 34 Cal. 109; Nevada Co. v. Kidd, 37 Cal. 283; Mitchell v. Mining Co., 75 Cal. 482, 17 Pac. 246; Peregoy v. McKissick, 79 Cal. 572, 21 Pac. 967; Civ. Code Cal. § 1410 et seq. The same rules prevail in Nevada: Lobdell v. Simpson, 2 Nev. 274; Ophir S. M. Co. v. Carpenter, 4 Nev. 534; Proctor v. Jennings, 6 Nev. 83; Barnes v. Sabron, 10 Nev. 218; Simpson v. Williams, 18 Nev. 432, 4 Pac. 1213. In Colorado: Wheeler v. Irrigation Co., 10 Colo. 583, 17 Pac. 487; Platte Water Co. v. Northern Colorado Irrigation Co., 21 Pac. 711; Coombs v. Ditch Co., 28 Pac. 966; Ft. Morgan L. & C. Co. v. South Platte Ditch Co., 30 Pac. 1033. In Idaho: Conant v. Jones, 32 Pac. 250. See, also, Atchison v. Peterson, 20 Wall. 507; Basey v. Gallagher, 20 Wall. 670; Broder v. Water Co., 101 U. S. 276; Gould, Waters, § 228 et seq.; Kinne, Irrigation, § 150 et seq. In the light of these principles and authorities, it is evident that neither appellant nor his predecessors in interest ever acquired any right by appropriation to the extent of water now claimed by him.

But the contention of appellees is that appellant is not entitled to any amount whatever, under or by virtue of any appropriation that was made of the waste water flowing in the Berry Roberts ditch upon which this suit was brought; that such rights as were ever acquired by such appropriation were either abandoned or lost by nonuser, by the statute of limitations, which is specially pleaded, and by the prescriptive rights acquired by a portion of the appellees, and that appellant is estopped, by the line of conduct and action of himself and his predecessor in interest, from asserting any right or claim to such waters for the purpose of irrigating his lands.

Grouping these questions together for the brevity of discussion, it may be said that, if any of them are well founded in fact, the judgment of the circuit court in dismissing the bill should be sustained. The legal principles in regard thereto are well settled. The general principles pertaining to an abandonment of water rights, which are applicable to this case, are clearly summed up in Black's Pom. Water Rights, § 96, where it is stated that the previous sections—

"Recognize the fact that there may be an abandonment of the exclusive right to divert and use water acquired by, or resulting from, a prior appropriation; that such an abandonment may be made either after the prior appropriation has become perfect and complete, and the right under it vested, or while it is yet imperfect and incomplete, and the right under it remains inchoate; and, finally, that an abandonment may be express and immediate, by the intentional act of the appropriator, or may be implied from his neglect, failure to use due diligence in the construction of his works, nonuser of them after completion, and the like. The general doctrine concerning the effect of such an abandonment, at whatever time or in whatever manner made, is well settled. The prior appropriator thereby loses all of his exclusive rights to take or use the water which he had acquired, or might have acquired, by his appropriation; and he cannot, after an abandonment, reassert his original right to the same, or the same amount of water, as against a second or other subsequent claimant, who has taken proper steps to effect an appropriation thereof."

In Water Co. v. Crary, 25 Cal. 509, the court said:

"The right of the first appropriator may be lost in whole, or in some limited portions, by the adverse possession of another; and when such person has had the continued, uninterrupted, and adverse enjoyment of the water course, or of some certain portion of it, during the period limited by the statute of limitations for entry upon lands, the law will presume a grant of the right so held and enjoyed by him."

In Davis v. Gale, 32 Cal. 34, the court said:

"A party acquires a right to a given quantity of water by appropriation and use, and he loses that right by nonuse or abandonment. Appropriation, use, and nonuse are the tests of his right."

In Smith v. Logan, 18 Nev. 154, 1 Pac. 678, the court said:

"The findings show that from the year 1861 until 1867, inclusive, Logan irrigated from ten to thirty-five acres of land. During the years 1868, 1869, and 1870 he made no use of the waters, and in 1871 and 1872 he irrigated but five acres. During these five years plaintiff and his predecessors in interest used the waters of the creek under their appropriations adversely to Logan. They therefore acquired the right to so much of the waters appropriated by Logan as he failed to use during the period limited by the statute of limitations."

Section 1007 of the Civil Code of California provides that:

"Occupancy for the period prescribed by the Code of Civil Procedure is sufficient to bar an action for the recovery of the property, confers a title thereto, denominated a title by prescription, which is sufficient against all."

Section 1411, under the title of "Water Rights," declares that:

"The appropriation must be for some useful or beneficial purpose, and when the appropriator and his successor in interest cease to use it for such a purpose, the right ceases."

The acts and conduct of appellant and of his predecessors in interest, relative to the use of the Berry Roberts ditch by the owners of the South Fork Company as part of their system for conveying the water which belonged to the South Fork ditch by right of prior

appropriation, are inconsistent with the claim made in the bill of complaint. In order to avoid the force and effect of this evidence, appellant contends that the original right of appropriation, as acquired by the locators of the Berry Roberts ditch, has been preserved and maintained by the assertions of Borron and appellant at various times during their respective ownership of the land, and during the time they were exclusively using the 30 inches of water from the South Fork or Timber ditch, "that they were entitled to the water embraced by the waste-water appropriation." Such declarations by words of mouth, unaccompanied by any act or deed in vindication and maintenance of them within the period prescribed by the statute of limitations, is wholly insufficient to keep alive the rights they had previously acquired by the appropriation and use of the waste water in the Berry Roberts ditch for the purpose of irrigation during the irrigating season. In Cox v. Clough, 70 Cal. 347, 11 Pac. 732, the court said:

"If the defendants used and held the water adversely for five years next before suit was brought, the mere disputing their right to such possession by the plaintiff would not prevent the bar of the statute. * * * The seventh finding might be literally true,—that is, defendants and their grantors might have 'claimed the right to the exclusive use of all the waters,'—and yet they may never have been for a moment in the possession of such waters."

No heed was ever given—no attention ever paid—to the asserted claim of ownership made by Borron or appellant. The asserted claim was never recognized nor in any manner respected by any of the appellees, nor by any of the parties using the Berry Roberts ditch for the purpose of conveying the water of the South Fork ditch therein. The contention of appellant that the use of the Berry Roberts ditch was consented to by appellant and his grantor, and only amounted to a temporary license, which was revocable at their will and pleasure, is not sustained by the facts. The suit is without merit, and devoid of any equity whatever. Appellant's rights to water for the purpose of irrigation have not been impaired. Whatever rights he or his grantor ever had to the waste water during the irrigating season have been lost by their conduct and by their nonuse of the water, and appellant is not in a position to complain of the use of the water of the Santa Ana river by other parties.

To recapitulate: The locators of the Berry Roberts ditch claimed the waste water of the river to irrigate their lands situate in section 16. After a few years they discovered that such waters were wholly insufficient for such purpose; that said ditch and the water rights acquired by its construction could not be relied upon to furnish water during the dry or irrigating season; that, to quote the language of one of the witnesses, the water was so scarce that the land was liable to "dry up and blow away." The locators then, for the purpose of obtaining the necessary quantity of water to irrigate their lands which were fit for cultivation, procured, by agreement and purchase, certain interests in the waters flowing in the South Fork or Timber ditch, which, with the North Fork ditch, had a prior right to the waters of the Santa Ana river, as against the

Berry Roberts ditch. After acquiring the waters of this ditch, they and their grantees stopped using any of the water they had formerly appropriated. They succeeded in making an agreement with some other owners of the South Fork to convey the waters from said ditch over into the channel of the Berry Roberts ditch, and prior to 1877 all the owners consented to this change of the waters, and united in its use. The owners of the South Fork ditch took absolute, complete, and exclusive possession, use, and control of the Berry Roberts waste-water ditch,—whether rightfully or wrongfully, by consent or otherwise, need not be here determined. They appointed overseers, or "water masters," as they are sometimes called, who issued time cards to the shareholders, and upon such cards allotted and distributed to the owners in the South Fork or Timber ditch all of the water which was taken and conveyed through the Berry Roberts waste-water ditch, to the entire exclusion of any and all other waters and water rights. After a few years' use of the water in this way, it was discovered that a great saving of water could be made by changing the course of the ditch, and taking the water out at a point further up the river, so as to avoid sandy places in the river bed. This change did not give the full relief anticipated, and another change was made. From the year 1874 up to the time of the commencement of this suit, in 1887, all of the water used upon the 240 acres of land now owned by appellant, for the purpose of irrigating the same, was water represented by the 30 shares in the Timber ditch owned by appellant and his predecessors in interest, and this amount of water is sufficient to irrigate said lands. The diversion and use of this water in the way and manner stated were with the knowledge, consent, and acquiescence of Borron, the immediate predecessor of appellant, and were claimed by the other owners of the South Fork ditch to be adverse to any right or claim under the original location and appropriation of the waste water in the Berry Roberts ditch. The testimony shows that the use of the waste water in the Berry Roberts ditch was abandoned, in so far as it had, prior to 1873, been used as a source of water supply during the irrigating season; that in 1874 the Berry Roberts ditch was taken possession of and used by the South Fork Ditch Company; that ever since that time the South Fork Company has had the sole and exclusive possession, use, management, and control of it; that all the water which has run through it has been the water actually appropriated by the South Fork Company; that during the full time of Borron's occupancy of the land, from June, 1874, to the fall of 1881, he never questioned the right of the South Fork Company to the waters flowing in the Berry Roberts ditch, or to any part or portion thereof; that during all this time he only received water to irrigate his land through the Berry Roberts ditch on his 30 shares from the South Fork Ditch Company. Substantially the same state of facts continued to exist after appellant purchased the land, in 1882. One witness, the son of appellant, testified that he protested, on behalf of appellant, against the use of the Berry Roberts waste-water ditch being taken by the South Fork Company, and that appellant occasionally used such water for irrigating his lands; but this use of the waters, it is admitted, was con-

fined to the nonirrigating season in the early spring or late fall of the year. Col. Tolles testified that the expense of constructing what was called the "South Fork" of the Santa Ana ditch in 1877 was paid upon the basis of the shares in the waters of the South Fork ditch; that the original Berry Roberts ditch was thereafter used to convey the waters of the claimants in the South Fork of the Santa Ana continuously, so far as he knew, until the injunction which was issued in this proceeding; that the South Fork or Timber ditch water filled the Berry Roberts ditch to its full capacity; that repairs were subsequently made upon the Berry Roberts or South Fork ditch pro rata, according to the ownership of the respective parties; that Mr. Borron and appellant paid their proportionate share; that the water was apportioned pro rata on the basis of ownership of the South Fork shares; that there was no distribution of waste water, to his knowledge, to either Borron or Ball, other than during the rainy season, at which time it was not the custom to confine distribution to the water tickets, but each party was then allowed to continuously use the water; that during the irrigating season no waste water was used or distributed in the Berry Roberts ditch. All the testimony of the several water overseers or water masters and time-keepers and others was substantially to the same effect. The waste-water rights of the Berry Roberts ditch location, having been lost by nonuser upon the part of Borron prior to the time when appellant acquired the land, could not be reasserted so as to acquire thereafter any right therein, except by the continued and adverse use of such rights for the period of five years, or by a new and valid appropriation of the water. In Cannon v. Stockmon, 36 Cal. 540, the court, in relation to this subject, said:

"A party who has been in the continued, exclusive, adverse possession for five years is entitled to the benefit of the statute of limitations, although the five years are not next preceding the commencement of the action."

As against the appellees who have acquired rights to the waters of Bear creek and the Santa Ana river subsequent to the location of the Berry Roberts ditch, the question here is, as stated in Hill v. Smith, supra:

"Has the plaintiff's use and enjoyment of the water for the purpose for which he claims its use been impaired by the acts of defendant?"

This suit, it must continuously be borne in mind, is exclusively founded upon the alleged rights of appellant of water for irrigating purposes during the irrigating season, and not for any deprivation of water during the rainy season, or the waste waters then flowing in the Santa Ana river, or through any of the many ditches or canals that have been mentioned. It is therefore necessary for appellant, in order to sustain this action as against the subsequent appropriators, to affirmatively show that his right to the waste waters of the Berry Roberts ditch for use during the irrigating season has been impaired by the wrongful and unlawful acts of the appellees to his injury. This he has not done. No injury has been shown. The absorption of the right to flow water into the Berry Roberts ditch by the South Fork Company, and the use of said ditch for the conveyance of the water were really beneficial, instead of detri-

mental, to appellant. Instead of the uncertain and insufficient quantity of water which then flowed in the Berry Roberts ditch, he has, under the agreements and changes in the condition, as before stated, obtained a valuable right amply sufficient to supply his wants, and to enable him to cultivate, irrigate, and improve his land. It cannot, in the light of all the facts and circumstances set forth in the voluminous record on file herein, be consistently claimed that his rights have in any manner been injured or impaired by the acts of appellees. In Sharp v. Hoffman, 79 Cal. 406, 21 Pac. 846, the court said:

"The gravamen of plaintiff's action being the deprivation of water for irrigation during the irrigating seasons in the years 1883, 1884, and 1885, whereby he suffered loss, it is incumbent on him to show by satisfactory evidence (Code Civ. Proc. § 1835) a right to the use of the waters of the creek during each of such seasons, and interference with such right and a consequent injury."

The same general principles are announced by the supreme court in Atchison v. Peterson, 20 Wall. 514. Mr. Justice Field, in delivering the opinion of the court, after citing and reviewing certain cases in the courts of California and Nevada, said:

"What diminution of quantity or deterioration in quality will constitute an invasion of the rights of the first appropriator will depend upon the special circumstances of such case, considered with reference to the uses to which the waste water is applied. * * * In all controversies, therefore, between him and parties subsequently claiming the water, the question for determination is necessarily whether his use and enjoyment of the water to the extent of his original appropriation have been impaired by the acts of the defendant."

Upon a review of the evidence, and of the principles of law applicable thereto, we are of opinion that the conclusion reached by the circuit court is correct. The judgment of the circuit court is affirmed, with costs.

KNOWLES, District Judge (dissenting). The first question presented for consideration is as to the jurisdiction of the court in which the suit was instituted. The suit was commenced in the circuit court of the United States for the Southern district of California. The first bill was filed on January 10, 1887. To this bill, answers were filed, and issue joined. Subsequently, considerable evidence was taken in the case. On the 5th day of November, 1888, complainant came into court, and asked to be allowed to withdraw his original bill of complaint, and to file an amended bill, which request was granted. On March 7, 1889, it was stipulated that the respondents in the suit might amend their answers to the amended bill of complaint on or before the 18th of that month. Other matters were also provided for in said stipulation. On the said 18th day of March, one of the respondents, named Brown, filed, instead of an amended answer, a plea in abatement to the jurisdiction of the court. The matters alleged were (1) that the complainant was a citizen of the state of California, and not of New York, as alleged in the bill, and that respondents were all citizens of the first-named state; (2) that other persons claiming, under the same title with complainant's, interest in

the property which is the subject of this suit are citizens of the state of California, but are not made parties complainant or defendant to said bill, and it is not in said bill made to appear that such other persons, or any of them, were requested to and refused to join with said complainant in bringing his said bill of complaint; (3) that such suit or bill does not really and substantially involve a dispute or controversy properly within the jurisdiction of said honorable court, in this: that parties have been improperly or collusively made and joined as defendants for the purpose of creating a case cognizable by said court. Complainant moved to strike out this plea as improperly filed, subsequent to the filing of an answer by said Brown, to the merits in the cause, and as a pleading not authorized by the stipulation in the case. The court sustained this motion, and the plea was stricken out. The cause was tried, and judgment entered for respondents. Complainant alone has appealed the cause to this court. This ruling of the court is not assigned as error; there was no hearing as to the facts presented in this plea. Had the motion to strike out been overruled, complainant would have had the right to have joined issue upon the facts set forth in the same. This court cannot consider any alleged error in this ruling of the court in striking out said plea. It is now urged that this court must consider the allegations set forth in said plea on account of the provisions of the act of March 3, 1875 (18 Stat. 472); that by virtue of that act, the practice as to pleas in abatement involving jurisdiction have been changed. The practice which has heretofore prevailed in the federal courts is that any plea in abatement should be filed and heard before any answer is made to the merits of the bill. It seems to be urged that this plea can be made at any time during the progress of the suit. The provisions of said act which it is urged have this effect are as follows:

"That if in any suit commenced in a circuit court or removed from a state court to a circuit court of the United States, it shall appear to the satisfaction of said circuit court at any time after such suit has been brought or removed thereto, that such suit does not really and substantially involve a dispute or controversy properly within the jurisdiction of said circuit court or that the parties to said suit have been improperly or collusively made or joined either as plaintiffs or defendants for the purpose of creating a case cognizable or removable under this act, the said circuit court shall proceed no farther therein, but shall dismiss the suit, or remand it to the court from which it was removed as justice may require."

There is nothing in this statute which would show that there was any intention of changing the order in which a defendant or respondent may make his pleadings. It does seem, however, that this statute has changed the mode in which the objection to the jurisdiction of the court may be made. Formerly the practice was to make it by plea: now it may be made in different ways. In the case of Morris v. Gilmer, 129 U. S. 315, 9 Sup. Ct. 289, the supreme court says:

"The statute does not prescribe any particular mode in which such fact may be brought to the attention of the court. It may be done by affidavits, or the depositions taken in the cause may be used for that purpose. However done, it should be upon notice to the parties to be affected by the dismissal."

In the case of Nashua & L. R. Corp. v. Boston & L. R. Corp., 136 U. S. 356, 10 Sup. Ct. 1004, it was held that the rule requiring the question of jurisdiction to be raised by demurrer or plea had been changed by said act of March 3, 1875. In the case of Anderson v. Watt, 138 U. S. 701, 11 Sup. Ct. 449, the supreme court again considered this point, and said:

"Under the act of March 3, 1875, determining the jurisdiction of circuit courts of the United States (18 Stat. 470, 472), the affection to the jurisdiction upon a denial of the averment of citizenship is not confined to a plea in abatement or a demurrer, but may be taken in the answer; and the time at which it may be raised is not restricted."

I think, upon a review of these decisions, it will be seen that the mode in which the objection to the jurisdiction may be made is changed by the statute, but not the order in which a plea in abatement to the jurisdiction may be filed. Except so far as the matters were presented in the discussion of this plea in abatement, the jurisdiction of the circuit court was not raised. There cannot be much doubt as to the ruling of that court as the case was presented. There does not seem to be any doubt but that the very questions sought to be presented by the said plea in abatement may be raised in this court without such plea. In the case of Morris v. Gilmer, supra, the supreme court said:

"At the present term, it was held that whether the circuit court has or has not jurisdiction is a question which this court must examine and determine, even if the parties forbear to make it, or consent that the case be considered upon its merits." Metcalf v. Watertown, 128 U. S. 586, 9 Sup. Ct. 173.

To the same effect is the case of Nashua & L. R. Corp. v. Boston & L. R. Corp., supra.

About the same questions as were presented in the plea in abatement were presented in the answers of respondents. It is proper that they should be considered. It is urged that the evidence shows that complainant was not a citizen of New York, but of the state of California, when suit was commenced. This is the evidence adduced to establish this fact. Harvy Hewitt, son of complainant, said, in giving in his evidence:

"Q. Where has your father resided since he returned to the state? A. A greater portion of the time he has resided on the ranch in section 16. Q. Is he a married man? A. My father? Q. Yes, sir. A. Yes, sir. Q. Has he had a family with him? A. Why, I should say he had."

There is some other evidence bearing upon this point. In speaking of a deed desired to be introduced in evidence, the complainant, in giving in his evidence, said:

"Q. Mr. Hewitt, since the taking of the testimony last fall, have you made any search for that deed? A. Yes, sir. Q. Where did you make that search for that deed? A. I have made it during— I made it among my home papers at New York."

The evidence shows that the complainant had been engaged in the mercantile business in Cleveland, Ohio, for 25 years, and that for the 18 years previous to his coming to California he had been in business in New York City. In speaking about his taxes he said he paid taxes on a house and lot in New York and on a house and lot in Cleveland. He made a contract to purchase the ranch, irrigated, from

time to time, by the water in dispute, in 1881. At that time complainant was in California for a short time, from two weeks to a month. In the spring of 1882 he was again in California for a time. In the fall of 1881 he placed a son, Harvy Hewitt, upon the said ranch, and entered into a partnership agreement with him for the cultivation of the same, and for a sale of one-half thereof. This was to continue for five years. In October, 1885, he came to California, and seems to have remained there most of the time until the bringing of this suit. At times, it would appear from the evidence, before and after the bringing of the suit, he went to New York for some purpose. The partnership agreement with his son was terminated in the month of July, 1886. On the 10th day of January, 1887, this suit was commenced. It should be observed that there was no evidence introduced which seems to have been intended for this issue of citizenship. The evidence came out casually when examining the witnesses upon other points. The evidence bears only upon the point of residence, and not upon that of citizenship. "Residence" and "citizenship" are not synonymous terms. Robertson v. Cease, 97 U. S. 646. In the case of Grace v. Insurance Co., 109 U. S. 278, 3 Sup. Ct. 207, the supreme court said of the plaintiffs: "They may be doing a business in, and have a residence in, New York, without necessarily being citizens of that state." There are numerous cases which show that a man may reside with a family in a place, and not be a citizen of the place. Citizenship rests very much in intention coupled with acts. There is perhaps a serious question arising in considering this point, owing to the fact that citizenship in New York is alleged in the bill and denied in the answer, and an allegation that complainant "was and is a citizen of the state of California." Upon whom does this cast the burden of proof as to citizenship,—the complainant or respondents? Before the act of March 3, 1875, above referred to, the rule in the federal courts was well established that, whenever the jurisdictional facts were averred in the bill or declaration, it should be taken as prima facie true upon this point, and the objection thereto should be taken by plea in abatement, and the burden of proof was upon the party making the plea. Sheppard v. Graves, 14 How. 505, 512; De Sobry v. Nicholson, 3 Wall. 420. I see no objection to continue this rule. As the matter now stands I apprehend it would not be sufficient to simply deny that complainant was a citizen of New York. That would not show a want of jurisdiction. Complainant might be a resident of some other state, where none of the respondents reside. The allegation that he was a citizen of California at the date of the suit is an affirmative allegation, and material. If the denial of the averment in the bill of citizenship casts the burden of proof on complainant, then all the former rules upon this point have been reversed, and it cannot be told whether or not a court has any jurisdiction of a cause until that question is established. Really, in an action at law, the question would be left to a jury. It could not be considered that a court had, prima facie, any jurisdiction to make any order in a case until this question of jurisdiction was settled. Holding, as I do, that the burden of proof is cast upon the respondents to establish, under the circum-

stances, want of jurisdiction in the circuit court, it must be held that they have failed upon this issue.

It is urged that the bill should be dismissed for the further reason that one Story, who, it appears, owns one-third of the Berry Roberts ditch, and the waste-water right used through the same, should have been made a party complainant in the suit. If he was a necessary party complainant in the bill, then this point may be well taken. It appears that Story was a citizen of the state of California, and was not only interested in the Berry Roberts ditch, but claimed some interest in the South Fork ditch of the Santa Ana river, Sunnyside Division. In the bill it is charged that the parties owning in this ditch had diverted, with others, water to which complainant was entitled. If the respondent Story was associated with the owners in that South Fork ditch, and had co-operated with them and others in diverting the water to which complainant was entitled, he was a proper party respondent. It seems to be urged, however, that, because Story was a one-third owner in the Berry Roberts ditch, complainant could not proceed without making him a party complainant, or showing some reason for not doing so. This presents the question, could the rights of Hewitt be determined, as far as the Berry Roberts ditch is concerned, without making Story a party, so that his rights would also be determined therein? This point was presented in the Mining Debris Case, 8 Sawy. 628, 638, 16 Fed. 25. In rendering a decision upon demurrer to the bill in that case, Judge Sawyer said:

"I am satisfied, also, that the complainant is entitled to maintain the suit without joining his cotenant or making him a defendant. His interest —his estate—is several. There is but a unity of possession. His interest or estate is capable of being injured, and he is entitled to have it protected from irreparable injury, whatever course his cotenant may see fit to pursue. He claims nothing against his cotenant. The cotenant is not an indispensable party to a determination of his rights. In this state, both before the Code, under the common-law rules, and after the adoption of the Code, by express provision carrying the former rule into it, it was settled that tenants in common could sue alone."

When a tenant in common is given the privilege, by a state statute, to sue alone to protect his rights, I do not see but this comes within the rule recognized by the federal courts,—that, where a right is given by a state statute, a federal court may be called upon to enforce it. The following cases maintain that one tenant in common can sue for an injury to his estate or interest: Goodenough v. Warren, 5 Sawy. 494, Fed. Cas. No. 5,534; Himes v. Johnson, 61 Cal. 259; Lytle Creek W. Co. v. Perdew, 65 Cal. 447, 4 Pac. 426. The diversion of water from one entitled thereto is in the nature of a private nuisance. Parke v. Kilham, 8 Cal. 79; Water Co. v. Chapman, Id. 392. All the rights of Hewitt in the Berry Roberts ditch can be adjudicated without joining with him his cotenant Story. It does not seem to me necessary that he should have been made a party complainant.

But it is also urged that certain parties who were owners in the South Fork and Sunnyside Division ditch, and whose names were suggested by the answers of respondents, were not made parties re-

spondent; that these parties were necessary parties, and therefore the bill should be dismissed. The claim is that the cause cannot proceed to judgment without these parties. This action is one in the nature of a suit to abate a nuisance. The nuisance is one that has existed, and is threatened to be continued. It is for the diversion of water from complainant's ditch and land, to which he is entitled, and the threatened continuation of this diversion. Complainant asks for an injunction to restrain and prevent this diversion. This being the nature of the suit, then the rule is that only those persons can be made parties respondent against whom an action at law can be maintained for damages for creating such a nuisance. Wood, Nuis. § 795. If we turn to the law, we find that, in an action for damages for the creation and maintenance of a nuisance, the persons who create and maintain the same are jointly and severally liable, and an action can be maintained against one or any number of the offending parties. Pom. Rem. & Rem. Rights, § 281. The creating of a nuisance is in the nature of a tort. It is difficult to see upon what ground an injunction could be asked against any one who it did not appear was engaged in the diversion of the water, although he might be an owner in the ditch into which the water was diverted. In the Mining Debris Case, supra, Judge Sawyer said:

"I can perceive no sound reason, in the established principles of equity jurisprudence and practice, why two or more of the parties injured by the common nuisance should not be permitted to unite, and two or more of those co-operating to commit it should not be joined in one suit to redress the injury, and to enjoin a continuance or increase of the nuisance thus in common inflicted."

The respondents, in their several answers to the bill, made certain denials of having diverted the waters of the Santa Ana river so as to prevent any of them from flowing down to the Berry Roberts ditch and to complainant's land; but these denials involve what is termed a "negative pregnant," and, as a fact, they admit such diversion. They are to the effect that they have not diverted, appropriated, or used any quantities of the water of the Santa Ana river in excess of the quantities lawfully belonging to any prior or subsequent appropriators, or any other waters than such as said respondents are entitled to as appropriators. They deny that they threaten to divert, appropriate, or use any waters of said Santa Ana river, except such as they are legally entitled to divert. They deny that the said respondents prevent any water flowing to the complainant's land to which he is legally entitled, or in any manner entitled. Now, as to all these parties, there can be no doubt they were made respondents properly, as they admit, as I have said, the diversion complained of. Whether, in doing so, they have interfered with any of the rights of complainant, is the matter to be determined in this action. I do not see how any statement in the answers as to the other parties show that they are necessary parties in this action, but that without them the case cannot proceed to judgment. Considering all these matters, I do not think the respondents have shown any lack of jurisdiction in the circuit court or in this court.

We come now to the merits of the case. It appears that the first appropriators of any of the waters of the Santa Ana river constructed

a ditch commencing at a point about three miles below the ditch of complainant. This ditch was called the "Timber Ditch," and was divided into two forks,—one called the "North Fork," and the other the "South Fork." The persons taking out water in what was known as the "North Fork" changed their point of appropriation to a point near the mouth of the cañon at which the Santa Ana river comes into the San Bernardino valley. They enlarged a ditch, which had the name of the "Cram and Van Leuven Ditch," or the "Van Leuven Ditch." This was done some years before the Berry Roberts ditch, in which complainant claims a two-thirds interest, was dug. In about 1869, Berry Roberts, George A. Craw, and Henry Suverkrup constructed the Berry Roberts ditch. In 1870 they had a record made by what are termed "water commissioners" of their location of a water right. This record shows that the appropriation was of the waste waters of the Santa Ana river. The evidence tends to prove the same fact,—that it was the waters that were not then appropriated by those who had constructed the Timber ditch, and the North Fork ditch that were thereby secured. These parties used these waste waters through this ditch for some time. Their grantees used them at times, certainly up to 1874. Prior to 1874, parties who owned in the South Fork of the Timber ditch began to sell out their interest in the waters appropriated thereby. The sale was of so many shares in the waters of the South Fork of that ditch. A Mr. Borron, who had become the owner of some 240 acres of the land for the irrigation of which this Berry Roberts ditch was constructed, with one Ball, who also owned an interest in this ditch, and some land, irrigated therewith, obtained some of the shares of this Timber ditch water, and began to divert in the dry season, in the summer, their share of the Timber ditch water through this ditch. In 1874 certain other parties, owners in the Timber ditch water, desiring to do the same thing, but not owners in the Berry Roberts ditch, made an agreement with the Berry Roberts ditch that upon certain conditions, to be hereafter stated, they were to be allowed to run their shares of water in the Timber ditch through this Berry Roberts ditch. In 1877 or 1878 the owners of the Timber ditch constructed a new ditch, commencing about three miles above the Berry Roberts ditch on the said Santa Ana river, called the "South Fork Ditch." Most of those who owned Timber ditch water, and who had been using the same through the Berry Roberts ditch, had their water interests turned into this new ditch. Since that time other ditches have been dug, which take out more or less of the waters of the said river.

It is, I think, well established that up to 1874, when the owners of the Timber ditch water began to divert their water through the Berry Roberts ditch, there was a waste-water right used through that ditch; that is, the water left in the stream after the South Fork and the North Fork or Van Leuven ditches were filled. Unless abandoned, two-thirds of that right has been vested in complainant through proper conveyances. The right of complainant in this waste water and the Berry Roberts ditch is now denied, and the use thereof prevented, by some of the respondents at least. It is contended that this right was lost by abandonment. The decision and judgment in

the circuit court was based upon this finding. Abandonment takes place of a water right when one having the right to use the same, and who is the owner thereof, gives the same up without any intention of using the same or exercising any ownership over or concerning it. St. John v. Kidd, 26 Cal. 264; Bell v. Red Rock T. & M. Co., 36 Cal. 214; Judson v. Malloy, 40 Cal. 299. The law does not presume abandonment; it must be established by the party alleging it. There has not been shown in evidence a declaration on the part of any owner in the Berry Roberts ditch showing an intention of abandoning the same. While it was held by Justice Field, in the case of Keane v. Cannovan, 21 Cal. 291, 303, that an abandonment might be inferred from lapse of time, and the delay of the first occupant in asserting his claim to the possession against parties subsequently entering upon the premises, he qualified this rule by the following:

"But in such cases the leaving of the premises must have been voluntary, and without any express intention of resuming the possession."

In that case the claimant of the premises left an agent in charge; and in regard to the effect of this he said:

"This circumstance is of itself sufficient to rebut the presumption of abandonment arising from the fact that he ceased to occupy them."

In this case, Borron, the grantor of claimant, left Col. Tolles as his agent in charge of his property, including his water rights. The fact of the owners of Timber creek water getting into possession of the Berry Roberts ditch appear to be about these: According to the evidence of Col. Tolles, a respondent in this case, an agreement was made between the parties, which he says was as follows:

"The agreement, in substance, was that, if (they having first forbid our use of water in that ditch by putting in a dam to shut it off from our use) we would contribute to the enlargement and the repair of the ditch, we could then divert our interest, and receive our water pro rata from the Timber ditch."

He stated also that it was in contemplation, at the time this agreement was made, that a new ditch should be constructed to convey the water of the South Fork or Timber ditch to the different owners. Witness Glover, called as a witness for complainant, said of this agreement:

"Mr. Ball was acting as water master, and he asked a question,—the parties were all together,—if this was a permanent thing. The answer given was that, as soon as the new ditch was built, they would have no more use for this Berry Roberts ditch. Well, under that understanding, the water went in, and no objection was made."

The evidence shows that the ditch was enlarged to double its former capacity, and the Timber ditch water owned by certain parties put into it. For the first year there seems to have been no regular apportionment of the water to different claimants. The next year (1875) there was, and the water tickets took notice of this wastewater right. Mr. Borron was there that year, and looked after the matter, it is presumed, himself. In 1877 or 1878 the new ditch was built, called the "South Fork Ditch," and most of those who had owned water in the Timber ditch took their water out of the Berry

Roberts ditch, and into this new ditch. Borron left his place, in 1875, in the hands of his agent, Tolles, one of the respondents. Borron writes to him to look after his waste-water right. In 1880, or before that time, there is a talk, it would appear from letters in evidence in the case, of bringing a suit to determine his rights in regard to this waste water. Tolles, his agent, and one of the respondents, writes him his waste-water right is in about the same condition as when he left. We find from the evidence of Glover that after the new ditch was built, in 1878, and the Timber ditch water turned into the same, there arose some dispute about this waste-water right, and that it was then used on the Hewitt place. The evidence is that at all times Borron was a great stickler for his waste-water right. Col. Tolles, a witness for respondents, said:

"He was particular to advise me to maintain intact all his water rights and interests, referring also to his claim in the waste-water right."

Again, Col. Tolles, in regard to certain language in a letter he wrote to Borron in 1880, said, when a witness:

"Q. In your letter to Borron, dated November 22, 1880, which you have identified as being your handwriting, you speak of the waste-water right of Borron being retained the same as when he was there? A. Yes, sir. Q. Now, what right did that have reference to, and right in what ditch? A. Well, the right was one which he always maintained after his purchase of the Suverkrup property, and the use of it through the Berry Roberts ditch."

On redirect examination he again testified:

"Q. You have just stated, in answer to the gentleman, that the waste-water right referred to there was one that had been maintained, as I understood you, by Mr. Borron. Maintained in what way, do you mean? What do you mean by the word 'maintained'? A. I meant to convey the idea that he had claimed such a right and interest, not strictly as maintaining it by its use, but by setting up that claim."

Again, Col. Tolles, upon cross-examination, after having testified that Borron had employed him as his agent, said, in response to the following questions:

"Q. You accepted that employment, and he left you as his agent in charge of the property, did he not? A. Yes, sir. Q. To protect his rights? A. Yes, sir. Q. In this matter that you are testifying to, as the privilege of putting in the water which you claim from the Timber ditch, Mr. Borron didn't propose to re-lease you any rights which he may have had, did he? He did not intend to give you any of his rights, did he, as you understood it? I mean to water. A. Not to water. Q. He did not intend to create in you any ownership of water, did he? A. No, sir. Q. It was simply as to whatever water you might have the right to bring from Timber ditch? A. Yes, sir. Q. So that substantially it was this: Whatever water you have a right to of the Timber ditch water you may put into our canal or our ditch? A. Yes, sir. Q. That, and nothing more, was it? A. That was all. Q. Provided you keep up the repairs as stated? A. Yes, sir. Q. That was the substance of it? A. Yes, sir."

This sort of questions and answers might be referred to for some time.

When Borron conveyed his property to Hewitt, he conveyed this waste-water right. The agreement for a conveyance was made in 1881, but the deed does not appear to have been signed until 1882. In 1881, Hewitt went into the possession of the property. The evidence of Harvy Hewitt is that he used this waste-water right on

claimant's place in 1881, 1882, 1883, and 1884. Valdez, a witness for respondent, states that, in 1884 and 1885, Hewitt used the waste water in the Berry Roberts ditch whenever he wished to, and it was not used on time tickets. Water in South Fork ditch was generally used on time tickets. The witness said that Harvy Hewitt, who was acting for his father, the complainant, always claimed that waste water, and used it whenever he wanted it. The evidence of both Borron and Hewitt is that they never at any time did anything looking to the abandonment of that water right. Tolles, as the agent of Borron, certainly had no authority to abandon that water right. I do not see how it can be maintained that either Borron or Hewitt ever intended to abandon that water right. But it is claimed that they lost it because they allowed the owners of the Timber ditch to use the Berry Roberts ditch for more than five years for running their water through the same. If I understand the claim, it is that these parties obtained the right to the Berry Roberts ditch by adverse possession. Mr. Borron, as has been stated, owned a two-thirds interest in that ditch in 1874 by purchase from one Suverkrup. Ball owned one-third by purchase coming from one of the locators and constructors of the Berry Roberts ditch. They had segregated the interest they had in the Timber ditch water, and diverted it through this Berry Roberts ditch. They were the legal owners of that ditch and that water. Tolles and other parties owning other interests in the same Timber ditch water were allowed, as has been sufficiently detailed, to put their water also into that ditch. But I do not see how it can be maintained, under the evidence stated, that they acquired any interest in the Berry Roberts ditch by virtue of that agreement. That ditch was to be used until New South Fork ditch was constructed, when the use of it was to be relinquished. Certainly, under the evidence, Borron used that ditch to carry his Timber ditch water up, until 1878. It should be borne in mind that the South Fork Water Company was not a corporation, but an association. Whatever titles or rights they acquired was as individuals in their individual capacity, and not in an associated capacity. As to this Timber ditch water they were tenants in common. They acquired their rights generally by purchase, and in their several names, as appears in evidence. The respondents have been particular to prove that, whenever required, Borron paid his share of all improvements and repairs on the Berry Roberts ditch; that through Tolles he paid his pro rata share of the building and maintaining the New South Fork ditch, and keeping that in repair. Under these circumstances, no adverse possession could arise in any of the South Fork ditch claimants, for certainly, with the others, Borron must have had possession of the Berry Roberts ditch and the New South Fork ditch all the time.

Under the statute of limitation it was held by the supreme court, in the case of Doswell v. De La Lanza, 20 How. 29, that the possession "must be, in the language of the authorities, actual, continued, adverse and exclusive for the space required by the statute." Could this possession be said to be exclusive when Borron and Ball were holding possession with the other claimants of water in the timber

ditch? "To render possession adverse, so as to set the statute of limitations in motion, it must be accompanied with a claim of title, and exclusive of every other right." McCracken v. City of San Francisco, 16 Cal. 594, 636, 637. At what time the respondents made a claim of title to the Berry Roberts ditch, I think it will be difficult to determine, and at no time was Borron or Hewitt denied the right to use it for Timber ditch water. It is said that the water was used under the supervision of a water master. He was no more than an agent of the parties holding these water rights. His possession of these ditches was their possession, if he ever had what is called "possession" of them. He was as much an agent of Borron as of the other parties. His duties, I think, only pertained to the apportioning of water by virtue of an agreement between the parties. There were certain parties—Tolles, Bates, and Dr. Barton—who went into the possession of the Berry Roberts ditch under an agreement with the owners. Their possession was that of the owners until they commenced to hold adversely. When did they commence to hold adversely? I am unable to tell from the evidence. But under the circumstances under which they went into the possession, before they could claim to be holding adversely, they would have to give Borron some notice that they were holding adversely. It is said that this notice was given to Col. Tolles, his agent. But Col. Tolles is one of the parties claiming adversely, according to the contention of respondents. I hardly think a court ought to consider a notice to him a notice to Borron. He was a man trusted and employed, according to his own evidence, to look after and preserve Borron's property, and yet he joined in with others to take away from him, according to the claims of respondents, without compensation, a valuable property interest Borron intrusted to his keeping. He was always a prominent member of the South Fork Ditch Company. I do not think that a court ought to hold that notice to him was notice to Borron. There is no other kind of notice claimed. "A silent possession accompanied with no act which can amount to an ouster, or give notice to his cotenant that his possession is adverse, ought not, we think, to be construed into an adverse possession." McClung v. Ross, 5 Wheat. 116, 124.

Taking into consideration that Borron must have been in possession of the Berry Roberts ditch to the extent that he used it for Timber ditch water, and we reach another point in the case that I think is conclusive, as far as the adverse possession of this ditch is concerned. "The rule is that, where there is a mixed possession,—that is, where there are two or more persons in possession, each under a separate conveyance or color of title,—the possession will be treated as being in him who has the better title, upon the ground that the seisin is in him who has the best title, and, as all cannot be seised, the possession follows the title." Wood, Lim. Act. § 261; Langdon v. Potter, 3 Mass. 215; Bellis v. Bellis, 122 Mass. 414. I think the case of Hunnicutt v. Peyton, 102 U. S. 333, 363–369, supports this doctrine. I do not see how it can be held that the respondents held any distinct and definite part of that ditch as against Borron. As tenants in common of the Timber ditch water, they had a unity of

possession, perhaps, of the Berry Roberts ditch. If there was any possession with Ball and Borron by the other parties using water in the Berry Roberts ditch, it was a mixed one, and hence the above rule must prevail. As I said before, one of the main issues in this case is as to the waste water. When did any of the respondents set up any claim to the waste water? Undoubtedly, that waste-water right was preserved up to 1875. The evidence seems to be conclusive that from that time up to 1878 the ditch was always filled, during the irrigating season, with Timber ditch water. In 1878 most all of those owning Timber ditch water transferred it to the New South Fork ditch. Then we hear again of this waste-water right. Glover, in his evidence, says that in 1878 most of the parties turned their water into this New South Fork ditch, and the question was asked him:

"Q. And did they cease, then, from taking any water through the Berry Roberts ditch? A. Well, no, sir; there was a claim set up then to that water as waste water. Q. Well, what was done about it? A. Well, there were parties, who owned their water in what was called the 'New Ditch,' claimed they had a right in the other ditch, and this was disputed by representatives of the Berry Roberts ditch, and it worked along that way for quite a number of years. Q. Well, what did the owners or claimers of the Berry Roberts ditch do in regard to the water in that ditch, or through that ditch? A. They undertook to use it. Q. Well, did they use it? A. Yes, sir. Q. Now, where was that water used, and who by? A. Well, it was used principally on what is now known as the 'Hewitt Ranch,' and what was known as the 'Berry Roberts Ranch,' or on this section 16."

The Berry Roberts ranch is the same as the Ball ranch. On the 1st day of January, 1882, Borron conveyed his rights to Hewitt. It seems Hewitt had gone into possession of all Borron's ranch, and property connected with his ranch, in San Bernardino county, in the fall of 1881. This was less than four years after we hear of any claim to this waste-water right. This is what Harvy Hewitt says as to his use of this right:

"Q. Now, state what use has been made, if any, of the waters of the Santa Ana river during the years from 1881 down to the present time by your father, if you know, and where has the water been used? A. The water has been used by my father in his place in section sixteen, township one south. Q. Well, how? A. Used for the purpose of irrigation. Q. For the last few years? A. In 1881 it was not used continuously because the ditch did not run the entire year through, but all the time that the water was in the ditch it was used. Q. You mean that the ditch did not run, or that the river didn't run, or that the water didn't run? A. The water didn't run. Q. Well, how in 1882, 1883, and 1884? Go right along. A. In 1882 we used the water with some exceptions. At some times the water was taken. We turned it back, and used it. Q. Well, how about the other years right along? Oh, state generally whether you used it. A. Well, generally in 1883. In the spring of 1884 the ditch— There was considerable water, and the Sunnyside water master took possession of it. Q. With your consent or without? A. Without our consent and under my protest."

The witness Valdez, called by respondents, said, in answer to questions of counsel for them:

"Q. How did you get your water? A. From Mr. Rob Roberts. Q. What is the name of the ditch,—Berry Roberts? A. Berry Roberts ditch and Sunnyside ditch. Q. Were you working there on time cards? A. I don't understand you. Q. Were you working there, having water issued to you then, or delivered to you on time, which was represented by a card? A. Well,

not Berry Roberts ditch. I don't recollect we ever used it in that way. He always claimed that as his water, and we always used it whenever we wanted to."

On cross-examination he testified:

"Q. You said, in your direct examination about this Berry Roberts ditch, he used that water whenever he had a mind to, didn't he? A. Yes, sir. Q. And irrespective of any time tickets, as far as you know? A. Not that I knew that there was any tickets of that water. Q. That was your understanding, was it? A. Yes, sir; that is the way I understood. Q. That there was no tickets? A. Yes, sir. He always claimed that water, and we used it whenever— He seemed to send the water whenever he wanted it."

This evidence pertained to the years 1884 and 1885. His evidence and that of Hewitt is corroborated by that of Glover upon this point.

I cannot find that as to this waste-water right it was definitely contradicted by any other evidence. There was never any location of a waste-water right by the South Fork Ditch Company. The action that was done in 1877 by the water commissioners cannot affect any title to the Berry Roberts ditch or the waste-water right. The recitation that they acted upon a petition of the owners of the Berry Roberts ditch does not prove the fact. This was a location of another ditch to be constructed from another point, and was used to convey these peregrinating water rights of the Timber ditch evidently as understood when they were put into the Berry Roberts ditch. The record says "E. A. Craw and William Curtis met at the mouth of the Santa Ana cañon, and did change the location of the Berry Roberts ditch in the following manner," etc. This is not a location of the Berry Roberts ditch. Its head is near three miles above that of the Berry Roberts ditch, and it covered and ran through different ground for most of its course. It seems, however, these parties claiming to own the Berry Roberts ditch, after they had changed its location, did not seem to want to give up the former location thereof. They now claim both. There is shown no right, as far as Borron is concerned, in these commissioners, to change the location of that ditch. At all events, it cannot be held to be a location of the waste-water right of Borron and Ball.

A contention of some kind seems to be made to the effect that the appropriation of the waste-water right was not valid because an appropriation of water must be for some beneficial purpose, and that it appears that more water was appropriated than would irrigate the land sought to be irrigated thereby. There is evidence that in that locality one inch of water will irrigate seven acres of land, and one witness gave evidence that, in cultivating some fruits, one inch would irrigate ten acres of land. If this would make the Berry Roberts waste-water right void, at the date of its appropriation, for the reason assigned, then the appropriation of water in the Timber ditch was also void. The claim that one inch of water suffices generally to irrigate seven acres or ten acres of land in the San Bernardino valley, where the soil is a sandy loam, and the atmosphere dry, does seem to me to tax even the credulity of one accustomed to irrigation in other sections of country to a considerable extent. When acquired, I do not think there is any doubt but that the Berry Roberts waste-water right was a valid one. The change of notions concerning irriga-

tion and the quantity of water needed for irrigation cannot affect it. It should be observed that the facts constituting an adverse possession are not pleaded. It should be observed that no facts showing adverse possession of either the ditch or water right in dispute are pleaded. The general rule is that the facts constituting the adverse possession should be stated. McCloskey v. Barr, 38 Fed. 165. There is no difference between a plea and an answer in this particular. The allegation that the action did not accrue within five years presents the question as to whether the action for the diversion of the water accrued within that time. There is no doubt but that respondents had diverted the water complainant claims within five years. The contention that the ceasing to use any parcel of property in its nature real estate, or an appurtenance thereto, for five years, would constitute abandonment thereof, cannot be sustained. No such arbitrary rule is applied in the consideration of this question. Time may be an element in determining intention, but not alone absolute proof of abandonment. Partridge v. McKinney, 10 Cal. 181; Moon v. Rollins, 36 Cal. 333; Judson v. Malloy, 40 Cal. 300. It devolved upon the respondents to show abandonment, and the rule is that it should be clearly established. Neither for this assigned reason do I find abandonment, and then the evidence does not show a ceasing to use the waste water for any one five years.

There is one further clause in the evidence of Col. Tolles I will recite as bearing upon this question:

"Q. What consideration, if any, has he had in this distribution as to the matter of waste water? A. There was no distribution of waste water, to my knowledge, to the parties mentioned,—Mr. Borron or Ball,—during that time, other than was during the rainy season, when all parties shared alike in the surplus water."

This is followed up by several answers.

Now, if the waste water was used at any time during the year by Ball and Borron, or either, that right was preserved. But, as I think I have shown before, there were no five years when this waste water was not used by some of the owners thereof in the irrigating season. It would seem to me that the act of allowing the owners of Timber ditch water to put their water into the Berry Roberts ditch by Ball and Borron was an act of neighborly kindness and accommodation, and the attempt of those thus favored to use this act to show that the owners thereof had thereby abandoned their right to the same, with the water right connected therewith, and that the respondents herein so accommodated had acquired all of the same, should not appeal with much force to a court of equity and conscience. Considering this case as best I could, I have been unable to reach the conclusion that either the ditch or waste-water right to which complainant asserts title has been abandoned by his predecessor in interest or himself. I will say that the record is an unsatisfactory one. Maps used on the hearing were left out by stipulation. They were needed to explain evidence. The evidence is so mixed up with objections and motions and immaterial evidence as to be confusing.

Complainant also makes claim to certain other water originally used in the Timber ditch. This is urged upon the ground, as I under-

stand, that this water was abandoned by the owners thereof. The Timber ditch was undoubtedly abandoned, and all water used in the same, and not transferred, may be considered perhaps as abandoned. If the equitable title in the same had been conveyed in any manner, undoubtedly this would not occur. But, allowing that it was abandoned, there is no showing that complainant ever appropriated the same. From 1875 to 1878 the Berry Roberts ditch was filled, most of the time, with Timber ditch water. There was no chance, up to that time, to appropriate the same by the user; but, if there was, it would not suffice.

In 1873 the Civil Code of California went into effect. Section 1415 of said Code, upon the subject of irrigation, provides:

"A person desiring to appropriate water must post a notice in writing in a conspicuous place at the point of intended diversion stating therein, (1) that he claims the water there flowing to the extent of (giving the number) inches measured under a four inch pressure; (2) the purpose for which he claims it, and the place of intended use; (3) the means by which he intended to divert it, and the size of the flume ditch, pipe or aqueduct in which he intends to divert it. A copy of the notice must within ten days after it is posted be recorded in the office of the recorder of the county in which it is posted."

There are other provisions of the statute not necessary to be here referred to. Then follows this provision:

"Sec. 1419. A failure to comply with such rules deprives the claimants of the right to use the water as against a subsequent claimant who complies therewith."

There were notices of the location of all such water by other parties. Neither complainant nor his grantors complied with this statute in making any appropriation to any of the abandoned waters of the Timber ditch. This claim is therefore not maintained.

The locators of the Berry Roberts ditch claimed a waste-water right. The water commissioner noted this claim. The evidence shows what was meant by this term, "waste water." It was the water that was left after the North Fork and the Timber ditch or South Fork ditches were supplied from the waters of the Santa Ana river. It is not an easy matter to determine from the evidence how much water was in fact appropriated as this waste water through the Berry Roberts ditch. Berry Roberts was of the opinion his ditch would carry about 175 inches of water, miners' measurement. Glover claimed that at one time it would carry about 300 inches, and at another time 200 inches, of water under miners' measurement. Tolles said that, at times Timber ditch water was put into it, it would not carry more than 100 or 150 inches of water, miners' measurement, but that the ditch was then out of repair. The evidence shows that, about the time the Timber ditch water was put in, the ditch was enlarged to double its capacity. There were measurements of the ditch after it was enlarged, that would appear to be reliable, that made the capacity of the ditch about 480 inches, measured as above stated. There is one thing to be noticed concerning the evidence estimating the number of inches of water in any ditch from 1860 to 1878. The early estimates of water were much less than the later, and the actual measurements seem to have shown at all times a much

larger amount of water than the estimates. Hence I think it would be safe to find that the Berry Roberts ditch appropriated 200 inches of water There is no dispute but that during certain months the Timber ditch and the South Fork ditch took all the water in the Santa Ana river. What was the exact time this occurred cannot be easily determined from the evidence. Some seasons this period was much shorter than others. I find that from about the 15th of June to the 1st of September of each year, as a rule, these ditches took all the water in the river. As I said before, it seems to be admitted by the answers of all the defendants that they did divert this waste water. If the respondents had each set out the amount of water he or it claims, there might have been a determination of the case to show who are the exact parties who diverted the water owned by claimant. As the case stands, the only decree that can be entered is an injunction enjoining all of the defendants from diverting this waste-water right from the 1st of September to the 15th of June of each year. My opinion is that the judgment of the circuit court should be reversed, and the cause remanded, and the circuit court directed to enter a decree according to this view.

This opinion was written with the thought that it might be adopted as the opinion of the court in the case. Finding that the majority of the court do not agree with the conclusions I have reached, I present the same as my individual views, and as a dissenting opinion.